UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MICHAEL HINTON,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        1:09-cv-00554-JAW
                                   )
OUTBOARD MARINE                    )
CORPORATION,                       )
      and                          )
OMC RECREATIONAL                   )
BOAT GROUP, INC.                   )
                                   )
            Defendants.            )


**ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY, TO STRIKE
REPLY TO ADDITIONAL STATEMENT OF MATERIAL FACT, AND FOR
SUMMARY JUDGMENT**

Concluding that there are genuine issues of material fact that preclude relief

on dispositive motions, the Court dismisses the Defendants' two motions for

summary judgment.  The Court also dismisses the parties' motions to exclude the

opposing experts concluding there is an insufficient context to adequately judge

whether the experts meet *Daubert* standards.   Finally, the Court grants the

Plaintiff's motion to strike the Defendants' statement of additional material fact.

I.      **BACKGROUND AND PROCEDURAL HISTORY**

Michael Hinton filed a complaint in Maine Superior Court, Waldo County, on

July 18, 2003 concerning an accident that occurred on September 10, 2000.  *State*

*Ct. R.* (Docket # 6).   After a series of motions for enlargement and amended

complaints complicated by an intervening bankruptcy and difficulties with service

of process, on October 30, 2009, OMC Recreational Boat Group, Inc. removed the action to this Court.[1]  *Notice of Removal* (Docket # 1).  Discovery closed on March 1, 2011, *Report of Telephone Conf. and Am. Scheduling Order* at 3 (Docket # 23), and the parties began filing motions in earnest.

On March 31, 2011, Mr. Hinton led off with a motion to exclude the testimony of the Defendants' expert witnesses.  *Pl.'s Mot.* in Limine *to Exclude or Limit Test. of Defs.' Expert Witnesses* (Docket # 48) (*Pl.'s Experts Mot.*).  On April 21, 2011, the Defendants responded to the motion to exclude.  *Defs.' Opposing Mem. of Law in Resp. to Pl.'s Mot.* in Limine *to Exclude or Limit Test. of Defs.' Expert Witnesses* (Docket # 70) (*Defs.' Experts Opp'n*).  Mr. Hinton replied on April 22, 2011.  *Pl.'s Reply Mem. in Support of Mot.* in Limine *to Exclude or Limit Test. of Defs.' Expert Witnesses* (Docket # 74) (*Pl.'s Experts Reply*).

Meanwhile, on April 1, 2011, the Defendants moved to exclude the Plaintiff's expert.  *Defs.' Mot. to Exclude the Test. of Pl.'s Expert, Robert V. Flynn* (Docket # 52) (*Defs.' Flynn Mot.*).  On April 22, 2011, Mr. Hinton responded.  *Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Exclude the Expert Test. of Robert Flynn* (Docket # 73) (*Pl.'s Flynn Opp'n*).  On May 6, 2011, the Defendants filed a reply.  *Defs.' Reply Mem. in Support of Their Mot. to Exclude the Test. of Pl.'s Designated Expert, Robert V. Flynn* (Docket # 76) (*Defs.' Flynn Reply*).

On April 11, 2011, the Defendants moved for summary judgment and filed a statement of material facts.  *Defs.' Mot. for Summ. J.* (Docket # 65) (*Defs.' Mot. for*

---

[1] The Court described this complex history in a December 22, 2010 Order denying the Defendants' Motion for Judgment on the Pleadings. *Order Denying Mot. for J. on the Pleadings* at 1-4 (Docket # 38).

*Summ. J.*); *Defs.' Statement of Material Facts in Support of Defs.' Mot. for Summ. J.* (Docket # 66) (DSMF). On April 22, 2011, Mr. Hinton responded to the motion and the Defendants' statement of material facts. *Pl.'s Mem. of Law in Opp'n to Defs.' First Mot. for Summ. J.* (Docket # 71) (*Pl.'s Opp'n to Summ. J.*); *Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts and Statement of Additional Facts* (Docket # 72) (PRDSMF; PSAMF). On May 6, 2011, the Defendants replied to the Plaintiff's response and to his statement of additional material facts. *Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J.* (Docket # 77) (*Defs.' Summ. J. Reply*); *Defs.' Reply to Pl.'s Statement of Facts and Defs.' Additional Statement of Undisputed Facts* (Docket # 78) (DRPSAMF; DASMF). On May 9, 2011, Mr. Hinton moved to strike the Defendants' statement of additional material facts. *Pl.'s Mot. to Strike "Defs.' Statement of Additional Undisputed Facts"* (Docket # 79) (*Pl.'s Mot. to Strike*). On May 31, 2011, the Defendants responded to Mr. Hinton's motion to strike. *Defs.' Resp. to Pl.'s Mot. to Strike Defs.' Statement of Additional Undisputed Facts* (Docket # 83) (*Defs.' Opp'n to Pl.'s Mot. to Strike*).

On April 11, 2011, the Defendants separately moved for summary judgment on the ground that the boat that is the subject of the litigation was manufactured by Four Winns, Inc., a separate corporation not named as a defendant. *Defs.' Mot. for Summ. J. on the Identity of the Mfr. of the Accident Boat* (Docket # 67) (*Defs.' Four Winns Mot.*). On the same day, the Defendants filed a separate statement of material facts in support of the motion. *Defs.' Statement of Material Facts in Support of Defs.' Second Mot. for Summ. J.* (Docket # 68) (DSMF – Four Winns).

Mr. Hinton responded on July 8, 2011. *Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. on the Identity of the Mfr.* (Docket # 93) (*Pl.'s Four Winns Opp'n*). He also filed a response to the Defendants' statement of material fact and a statement of additional facts. *Pl.'s Opposing Statement of Material Facts and Statement of Additional Facts* (Docket # 92) (POSMF – Four Winns; PSAMF – Four Winns). On July 22, 2011, the Defendants replied to the Plaintiff's opposition and to his statement of additional material facts. *Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. on the Identity of the Mfr.* (Docket # 95) (*Def.'s Four Winns Reply*); *Defs.' Reply Statement in Support of Defs.' Second Mot. for Summ. J.* (Docket # 96) (DRPSAMF – Four Winns).

## II.     THE PENDING MOTIONS

### A.     The Plaintiff's Motion to Exclude Experts

#### 1.     The Defendants' Experts and the Parties' Positions

In his motion, Mr. Hinton says that the Defendants designated three expert witnesses, Robert Taylor, Wendy Sanders, and Robert MacNeill. In general, Mr. Hinton asserts that the opinions of these experts are faulty because the opinions lack foundation, place an expert patina on common sense observations, express legal conclusions, amount to legal argument, and are irrelevant. *Pl.'s Experts Mot.* at 1-14.

In response, the Defendants contend that Mr. Hinton's position is "without foundation or basis." *Defs.' Experts Opp'n* at 1. They criticize Mr. Hinton for having failed to undertake any expert discovery and filing his motion "one day before the

discovery cutoff." *Id.* They say that Mr. Hinton engaged in an unwarranted "piecemeal attack" of their experts and has taken their opinions "entirely out of context." *Id.* at 4. The Defendants further argue: 1) that the Court must not accept mere argument of counsel as evidence; 2) that Mr. Hinton's motion does not comply with Rule 11 because the arguments do not have a reasonable basis; 3) that his motion violates Local Rule 7 because it is not supported by affidavits or other documents; 4) that the proffered expert opinions would aid in the jury's understanding of the evidence; and, 5) that his asserted troubles with their experts' opinions are matters for cross-examination, not admissibility. *Id.* at 5-14.

In reply, Mr. Hinton accuses the Defendants of making "numerous false statements about the facts and procedural history of this case." *Pl.'s Experts Reply* at 1. Mr. Hinton is especially annoyed with the Defendants' citation of Rule 11, noting that "Defendants cite no rule or case law in support of their inflammatory claim that the Plaintiff's decision not to depose Defendants' experts, but instead to move to exclude their opinions, is a Rule 11 violation." *Id.* Mr. Hinton then notes that some of the Defendants' arguments are directed to a theory of the case the Plaintiff is not pursuing. For example, Mr. Hinton observes that expert testimony about the warning on the boat addresses a "failure to warn" but that he is not pursuing a failure-to-warn theory; rather, he is claiming defective design. *Id.* at 4. Mr. Hinton reiterates the position that the defense's expert opinions will not be helpful to the factfinder and instead will "do nothing more than tell the jury what result to reach." *Id.* at 4-5.

## 2.    Discussion

First, the Court agrees with Mr. Hinton that the Defendants' Rule 11 argument is unwarranted on these facts.  Reference to Rule 11 raises the stakes for the opposing attorney because it presents the specter of attorney misconduct and sanctions.  *See Defs.' Experts Opp'n* at 5 (citing FED. R. CIV. P. 11(b)(3)).  Here, the Defendants assert that before filing the motion, Mr. Hinton failed to make "a reasonable inquiry under the circumstances" and to assure that his "factual contentions" have evidentiary support because he failed to depose the Defendants' experts.  *Id.*

The Court disagrees with the Defendants that Mr. Hinton's motion to exclude their experts without first deposing them constitutes a Rule 11 violation.  The Plaintiff's motion is based on the Defendants' own expert witness disclosures so the Defendants are not in a position to claim their own disclosures lack evidentiary support.  Furthermore, as Mr. Hinton pointed out, Rule 26 was amended in 1993 to require automatic expert disclosures and the Civil Rules Committee noted that "[t]he requirement under subdivision (a)(2)(B) of a complete and detailed report of the expected testimony of certain forensic experts may, moreover, eliminate the need for some such depositions or at least reduce the length of the depositions." FED. R. CIV. P. 26 advisory committee's note (1993).

Courts have uniformly rejected the Defendants' position: that the failure to depose an expert affects the right to object to the expert's testimony.  *Bolton v. WJV Miss., Inc.*, No. 08-0310-WS-M, 2011 U.S. Dist. LEXIS 6142, *14 (S.D. Ala. Jan. 20,

2011) ("[T]he defendant argues that any harm to the plaintiff is its own fault, because he did not demand a supplemental report or depose Dr. Graham. The defendant would shift the responsibility for an inadequate report from itself to the plaintiff, forcing the plaintiff to ferret out what the defendant, in violating Rule 26(a)(2), failed to provide and penalizing the plaintiff for not rescuing the defendant from the consequences of its omission"); *New Colt Holding Corp. v. RJG Holdings of Fl., Inc.*, No. 3:02cv173 (PCD), 2003 U.S. Dist. LEXIS 25309, *4 n.2 (D. Conn. Aug. 11, 2003) ("As [expert] reports may obviate the need to depose the expert, defendant's standing argument, *i.e.*, that plaintiffs may not move to exclude unless proposed experts are first deposed, is without merit"); *Bonesmo v. The Nemours Found.*, 253 F. Supp. 2d 801, 811 (D. Del. 2003) ("Contrary to plaintiffs' argument, the opposing party is not required to depose the expert to develop what his opinion is or the reasons for it"); *SEC v. Lipson*, 46 F. Supp. 2d 758, 763 n.3 (N.D. Ill. 1999) ("One of the purposes of the expanded disclosure requirement for expert reports . . . was to provide in substance the expert's direct testimony at trial. This was intended to allow the opposing party, if he or she so chose, to dispense with the expert's deposition"). This Court concludes that Mr. Hinton's failure to depose the Defendants' expert witnesses does not affect his right to move to exclude the expert testimony and does not constitute a Rule 11 violation.

At the same time, although Mr. Hinton plausibly asserts that portions of the proposed testimony address legal theories he is not pressing or amount to argument, the Defendants plausibly respond that Mr. Hinton has taken the

opinions out of context. Without a more complete context, the Court is reluctant to issue a fiat based on a limited glimpse of the evidence and its significance. If it is essential to obtain a pretrial ruling, the parties might request the Court to schedule a *Daubert* hearing to present a more complete understanding of the issues in the case and the context of the proposed testimony.

At this point, the Court dismisses the motion *in limine* without prejudice. The motion was useful in highlighting issues that counsel believe are at play in this case but, from the Court's perspective, those issues are not fully formed.

### B.    Defendants' Motion to Exclude the Testimony of Robert Flynn

#### 1.    Mr. Flynn's Proposed Testimony and the Parties' Positions

On October 15, 2010, Mr. Hinton designated Robert V. Flynn as a liability expert. *Defs.' Flynn Mot.* Ex. 2 (*Letter from Arthur J. Greif to Phillip S. Bixby*) at 3 (Docket # 52). According to the Plaintiff, Mr. Flynn is a safety engineer and would express the opinion that the swim ladder in this case "was unreasonably dangerous, defective and in breach of implied warranties in the manner in which it was attached to the boat." *Id.* The Defendants move to exclude the testimony of Mr. Hinton's expert witness Robert V. Flynn on the grounds that he is not qualified to express the opinions for which he has been designated and that his methodology and opinions fail to meet *Daubert* standards for admissibility. *Defs.' Flynn Mot.* at 1-18. Naturally, Mr. Hinton takes an opposing position. *Pl.'s Flynn Opp'n* at 1-9.

#### 2.    Discussion

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED. R. EVID. 702. The First Circuit has noted that experts "come in various shapes and sizes" and there "is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos v. Posadas De P.R. Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006) (citing *United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987) ("Expertise is not necessarily synonymous with a string of academic degrees or multiple memberships in learned societies")). At the same time, a testifying expert "'should have achieved a meaningful threshold of expertise' in the given area." *Levin v. Dalva Bros. Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (quoting *Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc.*, 405 F.3d 36, 40 (1st Cir. 2005)). "The test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702 — knowledge, skill, experience, training, or education." *Santos*, 452 F.3d at 64.

Here, Mr. Flynn is qualified to express expert opinions. Mr. Flynn is a graduate of Maine Maritime Academy who majored in nautical science. *Defs.' Flynn Mot.* Ex. 4 (*Biography of Robert V. Flynn*). He served as a deck officer in the United States Navy. *Id.* He has been employed as a safety engineer and safety director. *Id.* He is a professional member of the American Society of Safety Engineers and he has been self-employed as a safety consultant and expert witness since 1978. *Id.*

Mr. Flynn has withstood similar challenges to his qualifications in both state and federal court. In *Hall v. Home Depot USA, Inc.*, 752 F. Supp. 2d 58, 60-64 (D. Me. 2010), this District accepted Mr. Flynn as an expert witness. He has also testified as an expert in Maine state court. *Burns v. Wayne-Dalton Corp.*, No. CV-07-282, 2009 Me. Super. LEXIS 155, at *1-17 (Me. Super. Ct. Sept. 11, 2009). Accordingly, this Court will not exclude Mr. Flynn as an expert witness based on his qualifications alone.

The Defendants are free to explore on cross-examination the limits of Mr. Flynn's expertise and to offer countervailing expert opinions, if available, from witnesses with equal or more extensive training. Under standard jury instructions in this Circuit, the jury is instructed that it should consider the relative expertise of each expert in evaluating how much weight to give the expert's testimony. The Court declines to exclude Mr. Flynn's expert opinions based on his supposed lack of expertise; it is the function of the jury in this case to measure the convincing power of Mr. Flynn's expert opinions against the other evidence in this case and to arrive at a verdict.

Whether his proposed testimony meets *Daubert* standards is another matter. As it determined with the proposed testimony of the Defendants' experts, the Court is reluctant on this record to issue a definitive order. Instead, the Court would benefit from further development of the facts so that it can place Mr. Flynn's opinions in a more concrete context. For now, the Court will dismiss without prejudice the Defendants' motion *in limine* to exclude Mr. Flynn's testimony.

## C. Defendants' Motion for Summary Judgment

### 1. Plaintiff's Motion to Strike Defendants' Statement of Additional Undisputed Facts

In accordance with Local Rule 56, the Defendants filed a statement of material fact with their motion for summary judgment. DSMF; D. ME. LOC. R. 56(b). The Plaintiff responded with an opposing statement and with a set of additional facts. PRDSMF; PSAMF; D. ME. LOC. R. 56(c). The Defendants filed a reply statement of facts. DRPSAMF; D. ME. LOC. R. 56(d). However, the Defendants also filed ten additional facts. *Defs.' Statement of Additional Undisputed Facts* (Docket # 78).

The Plaintiff moved to strike the Defendants' ten additional facts on the ground that "Local Rule 56 does not permit such a filing." *Pl.'s Mot. to Strike* at 1. The Defendants insist that, under Local Rule 56(d), they are entitled to file additional statements of material facts "limited to the additional facts submitted by Plaintiff." *Defs.' Opp'n to Pl.'s Mot. to Strike* at 1 ("A party replying to the opposition to a motion for summary judgment <u>shall</u> submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party") (emphasis in *Defs.' Opp'n*). They justify the additional statement of facts by observing that when they filed their motion for summary judgment, not all the witnesses had been deposed, which "thereby allow[ed] Defendants to utilize their testimony by incorporating it into their subsequently filed Statement of Undisputed Facts." *Id.* Finally, they say that the Local Rules do not permit motions to strike and therefore the "Court should

strike Plaintiff's Motion to Strike Defendants' Statement of Additional Undisputed Facts." *Id.* at 2.

The Defendants are wrong. First, the Defendants quote only a portion of Local Rule 56(d); the full text of Local Rule 56(d) reads:

> A party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party. The reply statement shall admit, deny or qualify such additional facts by reference to the numbered paragraphs of the opposing party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by subsection (f) of this rule. Each such reply statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation.

D. ME. LOC. R. 56(d). "The clear language of Local Rule 56(d) requires the movant to limit its reply statement to admitting, denying or qualifying the responsive statement. It does not allow the movant to add new facts at this late stage." *Knowlton v. Shaw*, No. 09-cv-334-JAW, 2011 U.S. Dist. LEXIS 94954, at *18 (D. Me. Aug. 24, 2011). The Court addressed the rationale for this rule in *Knowlton*:

> The overall rationale of the rule is clear: there must be an end point. The Rule requires the movant for summary judgment to set forth those undisputed facts it contends entitle it to summary judgment; it permits the non-movant to put into play any facts, which the non-movant contends require trial. Finally, it permits the movant to respond to the non-movant's facts. But the Rule does not permit the movant to add yet another set of facts. If the movant were allowed to posit new facts in its reply, the movant's final document would be an unanswered set of factual assertions, which would run contrary to the requirement that the facts must be interpreted in a manner most congenial to the non-movant. In other words, if the rule were interpreted in the Defendants' fashion, to comply with Rule 56, the Local Rule would have to permit the non-movant to sur-reply. However there is no provision in the local rule for the non-movant to file a sur-reply precisely because the movant is not allowed to posit a new set of facts

with its reply statement. Finally, movants would be encouraged to hide their most salient statements of fact until the very end of the point-counterpoint process so that there would be no counter to their final point.

*Id.* at *18-19; *Brooks v. Local S7, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, No. 07-30-P-S, 2008 U.S. Dist. LEXIS 82585, at *11 n.2 (D. Me. Oct. 3, 2008) ("The summary judgment factual exchange stops at the second round, when a nonmoving party admits, denies, or qualifies each entry in the moving party's statement of material facts. The exchange does not, and cannot, extend indefinitely").

In addition to rejecting their misinterpretation of the language of the local rule, the Court rejects the Defendants' further arguments. The Court turns first to the Defendants' contention that further discovery justified an additional statement of material facts. Under the Court's amended scheduling order, the discovery deadline was March 1, 2011 and the initial deadline for filing dispositive motions was April 1, 2011. *Report of Telephone Conference and Am. Scheduling Order* (Docket # 23). The Defendants filed their motions on April 1 but the motions failed to comply with Local Rule 56 and there were problems obtaining the deposition of one of the witnesses; these issues led to a conference with the Court on April 8, 2011. *Report of Telephone Conference and Order* (Docket # 63). At the conference, the Court remedied the witness problem, struck the motions for summary judgment, and extended the time for Defendants to file dispositive motions to April 11, 2011. *Id.* at 2-3. The Defendants filed their motion for summary judgment on April 11, 2011.

The Defendants assert that "at the time of the original filing of Defendants' Motion for Summary Judgment and statements of facts incorporated therein, Justin Hinton and Terri Paquin had not yet been deposed, thereby allowing Defendants to utilize their testimony by incorporating it into their subsequently filed Statement of Undisputed Facts." *Defs.' Opp'n to Pl.'s Mot. to Strike* at 1. This statement is an act of legerdemain. Mr. Hinton and Ms. Paquin were deposed on April 6, 2011. DRPSAMF and DSAMF at Exs. 1, 3. It is technically true, as Defendants assert, that these witnesses were deposed after the "the time of the <u>original</u> filing of Defendants' Motion" but the Court struck those motions and extended the time for the filing of the Defendants' dispositive motions to April 11, 2011. *Defs.' Opp'n to Pl.'s Mot. to Strike* at 1 (emphasis supplied). These witnesses were deposed on April 6, 2011—five days before the filing deadline for the pending motions for summary judgment. To say that because these witnesses were not deposed before April 1, 2011, the Defendants could not incorporate their April 6th depositions into their April 11, 2011 motion is misleading and frivolous.

Second, if the Defendants wished additional time to depose these witnesses to ensure the incorporation of their testimony in their contemplated dispositive motion, they should have asked the Court to authorize the depositions beyond the discovery deadline and to extend the time for filing dispositive motions. They did not—perhaps because they knew the depositions would be completed on Wednesday, April 6, 2011, well in time for the Monday, April 11, 2011 deadline. Instead, the Defendants held back, failed to incorporate the Hinton and Paquin

depositions into their April 11th statement of material facts, and attempted to place their testimony before the Court on May 6, 2011, in violation of the Local Rule.

The Defendants' citation of Local Rule 56(e), which forbids the filing of motions to strike, is ironic. By filing a statement of additional material facts, the Defendants have violated Local Rule 56 and, when challenged, claim the protection of the Rule. If the prohibition against filing a motion to strike were taken to its extreme, a party could cavalierly violate the rules, yet punctiliously insist that the rules prevent a remedy. The Court is authorized to relax the Local Rules "in exceptional circumstances when justice so requires." D. ME. LOC. R. 1(a). Here, where the most logical means for the opposing party to bring a Rule 56 violation to the attention of the Court is a motion to strike, the Court relaxes the Local Rule 56(e) prohibition to allow the Plaintiff in this case to bring Defendants' Rule 56(d) violation to its attention.

In sum, the Defendants' position on this issue is not well taken. The Court STRIKES the Defendants' Additional Statement of Undisputed Facts (Docket # 78).

### 2. The Facts[2]

Michael Hinton admitted to "'vaulting' over the boat's transom onto the boat's swim deck while the boat's engine was on and propeller spinning in an effort to retrieve his son's hat."[3] DSMF ¶ 1; PRDSMF ¶ 1. Mr. Hinton stated:

---

[2] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Hinton's theory of the case consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In accordance with this obligation, the Court recites certain events as facts even though the Defendants dispute them.

[3] The Plaintiff interposed a qualified response to this and the next six statements of material fact, saying that the cited testimony is accurately quoted but denying the Defendants' editorializing. PRDSMF ¶¶ 1-7. The Court overrules these qualified responses. Since the statements are

15

As we approached the cap, I vaulted over the transom onto the swim platform with my right hand on the gunwale and my left hand on the swim ladder. My right hand slipped from the gunwale because it was wet. At the same time, a swell must have come up because I lost my balance.

DSMF ¶ 2; PRDSMF ¶ 2. Mr. Hinton testified he twice went onto the swim platform while the speedboat was under power in his effort to retrieve the hat; the first time he could not successfully hold onto the wet transom railing while reaching for the hat floating in the water. DSMF ¶ 3; PRDSMF ¶ 3. Mr. Hinton testified:

> Q. Okay. Was this the very first time you had stepped onto the swim platform, or had you stepped onto it one earlier time just before?
> A. I had stepped onto it just a minute before.
> Q. Okay. And where had you stepped onto the swim platform the first time?
> A. Right dead center of the stern.
> Q. And what were you using for a grip the first time?
> A. The railing, the - - transom, the - - the transom.
> Q. This raised rail on the - -
> A. Yes.
> Q. - - transom?
> A. Mm-hmm.
> Q. How was your grip on that raised rail of - -
> A. It was wet, and my hand slipped that time.
> Q. So what did you do?
> A. I climbed back in the boat.
> Q. And what decision did you make after you climbed back into the boat?
> A. To find a better way to do it. I saw the swim ladder and decided that was a better way to do it.

DSMF ¶ 4; PRDSMF ¶ 4. As to the first time over the transom, Mr. Hinton testified:

> Q. I'm talking about the first time.
> A. Oh, the first time. The first time, I went over and held the - - the railing.

---

accurately quoted, the qualified responses are too vague to pose a valid objection. At the same time, the Court has attempted to eliminate any overt editorializing.

Q. Okay. So your both - - both your hands were on the railing the first time?

A. Yes.

Q. Okay. Did both of them slip off of the railing, or did they stay?

A. I didn't give that second one a chance to slip.

Q. Okay. So you had one hand on the railing, and you said one slipped off. What caused it to slip off?

A. It was wet.

Q. Okay. I got that part. But if the - - if you're in the lee side of the island and you weren't getting any waves, why did it slip off?

A. We'd been out for an hour and a half.

Q. Okay.

A. Maybe two.

Q. Were you getting waves causing your hand to slip the first time?

A. Swells - - I - - I don't know what caused me to slip the first time. I attributed it to it being wet.

Q. Okay. But you had swells and the railing was wet?

A. Mm-hmm.

*** 

Q. Okay. Were you also crouched at that time - -

A. I was standing rather upright - -

Q. The first time?

A. - - and was - - yes. And the swell actually pitched me more inboard than out.

Q. Okay. So you - -

A. But my hand still slipped.

Q. Okay. One hand slipped and one didn't and you were standing upright the first time on the swim platform?

A. Ah-ha. And I was being pitched more inward at that point.

Q. Now - -

A. And I could tell it was a difficult task ahead of me.

DSMF ¶ 5; PRDSMF ¶ 5. Mr. Hinton further testified:

Q. You said, sir, that the reason you grabbed the ladder the second time around is you could not get secure enough purchase the first time; isn't that true, because your hand would - - your hand slipped the first time?

A. This is true.

Q. So you knew that when you went out there that you could fall into the water if your hand slipped as it did the first time and get hit by the prop, didn't you?

A. I - - didn't know.

Q. Did you reason that that was a real risk?

17

A.  Yes.  I took a calculated risk - -

Q.  Okay.

A.  - - in taking hold of the swim ladder.

Q.  And did you take a calculated risk the first time your hand slipped?

A.  I did.

DSMF ¶ 6; PRDSMF ¶ 6.  Mr. Hinton further described his position:

Q.  You get onto the swim platform - - you've got one hand on the railing, the right hand on the railing, the left hand on the ladder, swim ladder.  From that point in time, can you tell me, were you standing upright, were you crouching on down? What were you doing?

A.  I was crouching down.

Q.  Okay.  Were your knees fully bent like in a 45 degree angle, or - -

A.  Almost.

DSMF ¶ 7; PRDSMF ¶ 7.  Mr. Hinton testified further:

Q.  Did you realize you were taking a risk by hopping on the swim ladder with the engine on, the boat in reverse under power?[4]

A.  I took a calculated risk based on the assumption that the swim ladder would hold my weight as I did this.

Q.  And why did you presume that a swim ladder that is designed for a swimmer in the water to grab it would in any way hold your weight?

A.  The swim ladder was sticking up above the transom in such a way as it invited me to hold it.  It was an obvious - - if you want to talk about obvious, it was more obvious to have the swim ladder there than were the warning labels that we see here in these exhibits.

***

Q.  A cap in the water, it's your son's, and instead of him retrieving it, making sure the engine is off and the propeller is stopped spinning, you got over the transom, onto the swim ladder, grabbed ahold as I understand it - - I mean onto the swim platform, grabbed ahold of the swim ladder, and that's what you say happened that caused this accident, correct?

A.  Yes.  It - - well what caused it was it gave way.

***

---

[4] Mr. Hinton interposed a qualified objection to the first sentence of the quoted transcript, saying that it was not accurately quoted.  DSMF ¶ 8; PRDSMF ¶ 8.  The Court compared counsel's question in the Defendants' Statement of Material Fact with the transcript and sustains Mr. Hinton's objection.  In place of Defendant's question, the Court inserted a verbatim quote reflecting counsel's question.

Q. Why, when you know a spinning propeller is there, the boat is under power and it's backing up and you're out in the ocean, would you ever get on a swim platform?

A. We were on the bay, backing slowly to the hat, and I had firm grasp on the ladder. My plan depended on the ladder.

*** 

Q. Did you grab ahold of the railing? And if not, why not?

A. I did with my right hand. With my left hand, I had the ladder. So I did, in fact, grab the railing. But it was - - it was wet; something was wet. The railing was wet, my hand slipped off that railing. So that put me depending upon the ladder, which is why I continued my purpose on the swim platform.

*** 

Q. Okay. Was it unreasonable for you to grab ahold of the railing?

A. No. Because I did.

Q. All right.

A. And my hand slipped.

Q. Why did your hand slip?

A. It was wet. It's lower than the swim ladder, so any spray from the ocean, especially if you're backing or been out a while, the - - the wet is more likely to be on the railing than on the swim ladder that's higher. And I think that's probably - - you know, it looked like a really good place to hold. That's why I held it.

Q. And so you've got your left hand on the railing?

A. No. My right hand on the railing.

Q. Okay. You got your right hand - - are you dominant - - right hand dominant?

A. Yes, sir.

Q. Okay. So you've got your right hand on the railing. Why if you're trying to reach for a hat did you ever touch the swim ladder? Because you got to have a hand to touch the - - to get the hat, right? So you're holding on with your dominant hand onto the railing, you're leaning out to grab the hat. Why did you grab the swim ladder?

A. I didn't have a chance to reach for the hat because the ladder gave way before - -

Q. You - - okay.

A. - - just, you know, like maybe that long before we were upon the hat. I was contemplating getting the hat; so when my hand slipped off the railing, I grabbed my knee to kind of right myself.

*** 

Q. So you had ahold of the railing with your right hand. You're hanging onto it, and for reasons - - what was your reason to grab the boarding ladder at that juncture when you're holding onto the railing?

A. It appeared to me a better grip than the railing.

DSMF ¶ 8; PRDSMF ¶ 8.  The boat contained a warning sign that read:

DANGER

MAKE SURE ENGINE IS OFF AND PROPELLER IS STOPPED BEFORE USING BOARDING LADDER.

DSMF ¶ 9; PRDSMF ¶ 9.[5]  Robert Flynn, the Plaintiff's liability expert, acknowledged at his deposition that "it says, essentially in black and white, make sure the engine is off and propeller stopped before using boarding ladder."[6]  DSMF ¶ 10; PRDSMF ¶ 10.

Mr. Hinton testified:

A. . . . I fell in, even though I - - I was swung out, I still fell in relatively behind the boat.  But when I came up, I was surprised to see the port side of the boat, and actually very little of the transom at that point, but mostly the port side of the boat.  That was curious to me.  And then when I tried to level out to swim, it seemed awkward to me.  I couldn't figure out what was wrong.  But then my mind went to the fact that my deck shoe was coming off.  And I didn't want to lose my deck shoe, so I pulled it back on.  And then suddenly, the boat was there.

DSMF ¶ 12; PRDSMF ¶ 12.

Robin Sprague, an eyewitnesses and the Plaintiff's fiancée at the time, testified that Michael Hinton fell overboard from the port side of the speedboat while reaching for his son's hat.  DSMF ¶ 13; PRDSMF ¶ 13.  Ms. Sprague testified:

Q.  So from the moment the hat blew into the water, can you tell me what happened?

---

[5] The Plaintiff interposed a qualified objection to the Defendants' characterization of the warning sign and therefore the Court quoted the language from the sign itself.  DSMF ¶ 9; PRDSMF ¶ 9.  The Plaintiff also objected to the portion of this statement that describes the location of the warning sign as not supported by the record citation.  PRDSMF ¶ 9.  The Court agrees and has not included the portion of the Defendants' statement that describes the location of the warning sign.

[6] The Plaintiff denied Defendants' statement of material fact paragraph 11 on the ground that the statement is not supported by the record citation.  PRDSMF ¶ 11.  The Court agrees and has not included the paragraph in its recitation of the facts.

A. The hat blew into the water, the boat was still running because it's a large boat. Justin - - I think we were yelling to Topper [Christopher Sprague] that the hat was in the water, and it's a loud boat, so we had to keep yelling to have that fact be known and then recognize because also, you could see it. Michael stood up, he was - - first he tried to reach out to get the boat like that - - I mean, the hat like that. Topper was yelling, sit down. He yelled that very forcefully several times, several meaning two at least, perhaps three. Michael stood up. I saw his hands go up and his leg go up, and then he fell over approximately here (indicates).

Q. You're taking your finger and you're - -

A. I'm pointing to the back left-hand side of the boat.

Q. Why don't you make an arrow where you're pointing.

A. (Indicates).

Q. And you've made an X, and what does that X mean?

A. The X means that to my memory that's approximately where he fell.

Q. So he fell into the water at that X as best you recall?

A. Yes, as best I recall.

Q. Did you see that happen?

A. Yes. I saw that happen.

DSMF ¶ 14; PRDSMF ¶ 14. She further testified:

Q. Okay. What happened after that? The hat, what color was the hat?

A. I'm not even sure anymore. It was either a dark color like a navy blue or a tan. I can't remember, but it said Navy on it. That's what I most remember.

Q. Before we get to what happened next, Mr. Hinton, you saw him before he fell into the water, you saw him reaching over the side of the boat for the hat; is that - -

A. Yes, and I think Justin may have been, too. I can't say for sure. It seems like there was an effort on both their parts to reach the hat and my brother saying sit down, sit down.

DSMF ¶ 15; PRDSMF ¶ 15. Ms. Sprague testified that, at the moment Mr. Hinton fell into the water over the port side of the boat, the hat was six to eight feet away.

DSMF ¶ 16; PRDSMF ¶ 16. She further testified:

Q. Okay, so let's go back to the moment that Mr. Hinton falls into the water. What do you remember from that point onward?

A.  [Michael Hinton] got - - he swam and he got the hat, and he held it up and he smiled, and the boat was not moving - - it was still going but it was not moving.  He swam back toward the boat with the hat, and he was here (indicates) where there's a swim ladder.

Q.  You're pointing at the diagram now.  Why don't you make - - Why don't you make a Y where you're describing where he was at this moment.

A.  With the hat.

Q.  So you've just made a Y off the stern of the boat on the left side.  And you can continue your testimony.

A.  Okay.  He had the hat in one hand; I don't quite recall which hand.  He is reaching up to the ladder.  He's got his hands on it, and we - - Justin and I are there in the back of the boat.  Justin is closer to him.  Justin is on my right, we're facing Michael, and all of a sudden his face changes to an utter mask of pain, and he said, I'm hurt, or I'm - - then we knew something was - - and his hands - - at least one of them fell away from the ladder at that same time, and then - - I'm trying to get this chronologically.  He initially had his hands on the ladder, his face changed, the hands fell away - - at least one of them - - from the ladder, and we knew - - he said something, I'm hurt, and then Justin pulled him in, and his leg was practically detached.  It looked like lobster meat.  It was not recognizable as a leg.

DSMF ¶ 16; PRDSMF ¶ 16.

The warnings on the boat were very small and the color was such that Robert Flynn does not believe that they would meet the standard for warnings.[7]  PSAMF ¶ 17; DRPSAMF ¶ 17.  Michael Hinton did not see any warning labels on the boat.  PSAMF ¶ 18; DRPSAMF ¶ 18.  Mr. Hinton fell out of the boat because the swim ladder gave way under his grasp.[8]  PSAMF ¶ 19; DRPSAMF ¶ 19.  At the time the ladder snapped and Michael Hinton fell into the water, Justin Hinton was

---

[7] The Defendants denied this statement.  DRPSAMF ¶ 17.  A portion of the denial is based on their position regarding the admissibility of Robert Flynn's testimony, which the Court has addressed.  Further, the Defendants point to the testimony of their own experts.  However, the Court has included the statement because it is required to view the facts in the light most favorable to the non-movant.

[8] The Defendants denied this statement, citing testimony of other witnesses.  DRPSAMF ¶ 19.  The Court included the statement because it is required to view the facts in the light most favorable to the non-movant.

approximately three feet away from Michael Hinton and had Michael Hinton in full view.[9] PSAMF ¶ 20; DRPSAMF ¶ 20. Justin Hinton testified that Michael Hinton fell out of the boat and was completely submerged underwater for about four seconds. When Michael Hinton resurfaced and his face broke the plane of the water, Justin Hinton immediately observed blood in a five to six foot radius around Michael Hinton.[10] PSAMF ¶ 21; DRPSAMF ¶ 21. Within about fifteen seconds after Justin Hinton saw blood around Michael Hinton as he resurfaced, Justin Hinton had pulled Michael Hinton back into the boat; the entire event took only 25 to 30 seconds.[11] PSAMF ¶ 22; DRPSAMF ¶ 22. Michael Hinton never retrieved Justin Hinton's hat that had blown into the water.[12] PSAMF ¶ 23; DRPSAMF ¶ 23. Terri Paquin testified that she saw Michael Hinton fall into the water and the next thing she saw was Justin Hinton and Robin Sprague pulling Michael Hinton out of the water; Ms. Paquin does not remember seeing Michael Hinton swimming to get a hat or swimming toward the boat. PSAMF ¶ 24; DRPSAMF ¶ 24.

---

[9] The Defendants denied this statement, saying that the "Plaintiff mischaracterizes the record in that Justin Hinton stated he was three feet from the ladder, not the Plaintiff, inside the boat with the transom and transom seating between him and the ladder off to one side." DRPSAMF ¶ 20. The Court is nonplussed by this objection. If Mr. Hinton was on the ladder when it snapped and if Justin Hinton was three feet from the ladder, Justin Hinton would also have been three feet from Michael Hinton. The Court overrules the Defendants' objection and accepts the statement. The Defendants also object based on other portions of Justin Hinton's testimony; the Court rejects that portion of the denial because it is required to view the facts in the light most favorable to Mr. Hinton.

[10] The Defendants interposed a qualified response, stating that "Justin Hinton stated as such after speaking with Plaintiff's counsel and comparing notes." DRPSAMF ¶ 21. The Court refuses to accept the qualified response and deems the paragraph admitted. At best, the qualification goes to Justin Hinton's credibility and at this stage, the Court is required to view the facts in the light most favorable to Mr. Hinton.

[11] The Defendants interposed a qualified response in part for the same reason in paragraph 21. In addition, the Defendants point to supposedly contradictory testimony from other witnesses. The Court refuses to accept the qualified response and treats the statement as admitted.

[12] The Defendants denied this paragraph, citing Robin Sprague's testimony. DRPSAMF ¶ 23. The Court refuses to accept the Defendants' denial and treats the statement as admitted.

### 3. The Parties' Positions

The Defendants base their motion for summary judgment on two theories: (1) that there is "no cause in fact or proximate cause between Plaintiff's product liability ladder claims and Plaintiff's injury accident"; and (2) that "Plaintiff's fault is greater than any he has alleged against Defendants and his claim is barred thereby." *Defs.' Mot. for Summ. J.* at 13, 15.

The Plaintiff responds by saying that these issues are matters for jury resolution. *Pl.'s Resp. to Defs.' Mot. for Summ. J.* at 2-6.

### 4. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). For summary judgment purposes, "genuine means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a material fact is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations nor improbable inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (citation and internal quotation marks omitted).

### 5. Discussion

The Defendants' motion for summary judgment is hopeless on these facts. First, as the Defendants themselves acknowledge, not all the witnesses agree about the details of this accident. *Defs.' Mot. for Summ. J.* at 8 ("Bizarrely, in the deposition of Plaintiff's fiancée and eyewitness to this accident, Robin Sprague, Ms. Sprague describes an entirely different accident than the one testified to by Michael Hinton"). Where there are manifest differences—amounting to the bizarre or not—as to what actually happened, only a jury can resolve those differences.

Second, the Defendants' proximate cause contention is that Mr. Hinton was injured because he became disorientated after he tumbled into the water, and the boat operator failed to cut power to the propeller, thereby causing the injuries to Mr. Hinton's leg. According to the Defendants, Mr. Hinton's injuries were thus a result of his own negligence and the negligence of the boat operator. *Id.* at 13-14.

But under Maine law, proximate cause "is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred." *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778, 780 (citations omitted). The *Merriam* Court explained:

> Evidence is sufficient to support a finding of proximate cause if the evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence. The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, the defendant is entitled to a judgment.

*Id.* ¶ 8, 757 A.2d at 780-81.

Here the question narrows to whether there is a genuine issue of material fact as to whether the manufacturer of a defective swim ladder on a boat should anticipate that a person who falls into the water as a result of the defect is at risk of becoming disoriented and that a boat operator, attempting to rescue a man overboard, could fail to cut the propeller in time to avoid injury.

As the Maine Supreme Judicial Court has pointed out, "[t]he question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is generally a question of fact, and a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757, 759. *See Dyer v. Me. Drilling & Blasting, Inc.*, 2009 ME 126, ¶ 32, 984 A.2d 210, 219 ("The question of causation is generally one of fact to be determined by the fact-finder").

Regarding the Defendants' contention that the boat operator caused the injury by failing to cut the power to the propeller, the argument assumes that a fact-finder would conclude that the boat operator was in fact negligent in his operation of the boat, a fact that the Court cannot determine on this record. Furthermore, if the boat operator's negligence did contribute to Mr. Hinton's injury, this would not necessarily absolve the Defendants. Maine law has long held that "[a]n injury . . . may have more than one legal cause. Two or more persons or things may act either independently or together to cause injury or damage, and in such a

26

case each may be a legal cause." Donald G. Alexander, MAINE JURY INSTRUCTION MANUEL § 7-81 (4th ed. 2003).

The analysis of comparative negligence is similar. Under Maine law, comparative negligence under 14 M.R.S. § 156 is available as a defense to a strict liability action under 14 M.R.S. § 221. *Austin v. Raybestos-Manhattan, Inc.*, 471 A.2d 280, 283 (Me. 1984). But the Maine Supreme Judicial Court also limited the type of negligence available as a defense to a strict liability action:

> [C]ontributory negligence consisting merely in a failure to discover the defect in the product or to guard against the possibility of its existence is not "fault" of the plaintiff under section 156; but . . . on the other hand contributory negligence of a form commonly passing under the name of assumption of the risk, consisting in voluntarily and unreasonably proceeding to encounter a known danger, does constitute such "fault."

*Id.* at 286. As the authors of MAINE TORT LAW explained, "[t]o place a responsibility on a consumer to discover product defects places a burden on the consumer which strict liability was intended to remove." Jack H. Simmons, Donald N. Zillman, David D. Gregory, MAINE TORT LAW § 12.09 (2004 ed.). Although the Defendants have a strong argument that Mr. Hinton "voluntarily and unreasonably proceed[ed] to encounter a known danger," a jury could also conclude that Mr. Hinton did not know about the defect in the swim ladder. The resolution of this question depends on a fact-finder.

Moreover, as the Maine Law Court made clear in *Austin*, the jury's task under section 156 is to "compare the conduct of the seller of an unreasonably dangerous product with the contributorily negligent conduct of the plaintiff." 471

A.2d at 285. On this record, which contains virtually no information about the nature of the defect, the Court is in no position to make that evaluation—and to compare degrees of negligence—and is certainly in no position to rule that, as a matter of law, Mr. Hinton's negligence was equal to or greater than the Defendants' liability. The Court dismisses the motion for summary judgment without prejudice.

### D. Defendants' Four Winns Motion

#### 1. The Parties' Positions

The Defendants have also moved for summary judgment on the ground that Mr. Hinton has sued the wrong parties, saying that neither Outboard Marine Corporation nor OMC Recreational Boat Group, Inc. designed or manufactured the boat involved in this accident and that the actual designer is Four Winns, Inc., a party the Plaintiff dismissed on March 26, 2009. *Defs.' Four Winns Mot.* at 1-4. Further, the Defendants contend that the statute of limitations has run as to Four Winns. *Id.* at 5. Mr. Hinton vigorously disputes the factual underpinnings of the Defendants' motion. *Pl.'s Four Winns Opp'n.* at 1-5.

#### 2. Discussion

Based on this highly contested record, the Court cannot begin to determine whether Four Winns is the proper Defendant. Not surprisingly, in his responsive statement of material facts, Mr. Hinton denied the Defendants' critical assertions.[13]

---

[13] For example, the first sentence of paragraph 12 of the Defendants' Statement of Material Facts reads:

> The above representation by Plaintiff[']s counsel to the State Court was false.

DSMF – Four Winns ¶ 12. The Defendants' statement of supposedly undisputed material fact includes the assertion that Mr. Hinton's lawyer made a false representation to the State Court, an

In their responsive statement of material facts, the Defendants admitted only one of Mr. Hinton's ten statements of material fact. DRPSAMF ¶ 25. The parties agree only on the most incontestable facts, such as that the Plaintiff originally filed the Complaint in state court. The parties flatly dispute whether the Plaintiff is entitled to rely on representations made by the bankruptcy trustee for Outboard Marine Corporation during the bankruptcy process and what those representations were. For example, the Plaintiff says that the attorneys for the trustee of Outboard Marine Corporation represented that Four Winns was "a division of OMC" and "had been in bankruptcy since December 22, 2000." PSAMF – Four Winns ¶ 20. The Defendants declaim this statement as "false," affirmatively stating that Four Winns, Inc. had been dissolved since 1995. DRPSAMF – Four Winns ¶ 20. The Court is also unclear about the significance, if correct, of the bankruptcy court's lifting of the bankruptcy stay in the Outboard Marine Corporation bankruptcy to allow Mr. Hinton to proceed in a lawsuit so long as the recovery was limited to insurance proceeds. DRPSAMF – Four Winns ¶ 21.

To grant a motion for summary judgment, the Court is required to determine that there is "no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). On whether Four Winns is the appropriate defendant, there appears virtually no agreement as to any material fact. This case with its series of shifting corporate identities, successor corporations, dismissals, service of process defenses, and an intervening bankruptcy, seems particularly refractory to summary disposition.

---

assertion the Defendants had to know would be disputed. The Defendants also say that the Plaintiff's statement about what he was told by the attorneys for the bankruptcy trustee for Outboard Marine Corporation is false. DSMF – Four Winns ¶ 20.

The Court dismisses the motion without prejudice.[14]

## III. CONCLUSION

The Court DISMISSES without prejudice the Plaintiff's Motion *in Limine* to Exclude or Limit Testimony of Defendants' Expert Witnesses (Docket # 48), the Defendants' Motion to Exclude the Testimony of Plaintiff's Expert, Robert V. Flynn (Docket # 52), Defendants' Motion for Summary Judgment (Docket # 65), and Defendants' Motion for Summary Judgment on the Identity of the Manufacturer of the Accident Boat (Docket # 67). The Court GRANTS the Plaintiff's Motion to Strike "Defendants' Statement of Additional Undisputed Facts" (Docket # 79).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 21st day of November, 2011

---

[14] It strikes the Court that this issue should be resolvable by an agreed statement of facts. The Court suspects that the parties do not really disagree about much of what is set forth (and denied or qualified) in their contested statements of material fact. If the Plaintiff, after all his efforts, has targeted the wrong Defendant, it would seem better for him to know this now rather than after an expensive trial. The same is true for the Defendants. If there truly is a core set of contested facts, the parties could agree to present this issue to the Court for resolution both on the facts and law. But the Court must leave these strategic decisions in the hands of able counsel.